## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| **MAYNOR ARMANDO C. G.,** | **Civil Action No.  20-5652 (MCA)** |
| **Petitioner,** | |
| **v.** | **MEMORANDUM OPINION** |
| **JOHN TSOUKARIS, et al.,** | |
| **Respondents.** | |

**ARLEO, UNITED STATES DISTRICT JUDGE**

Petitioner Maynor Armando C.G. ("Petitioner") is a native and citizen of Honduras, who is currently in the custody of the United States Department of Homeland Security ("DHS"), Immigration and Customs Enforcement ("ICE"), and detained at Essex County Correctional Facility (ECCF or the "Facility") in New Jersey.  On May 7, 2020, Petitioner filed a Petition for Writ of Habeas Corpus under 28 U.S.C. § 2241.  ECF No. 1.  On May 11, 2020, Petitioner filed a TRO application seeking his immediate release from detention based on his medical conditions that render him vulnerable to severe illness or death if he were to contract the novel coronavirus disease 2019 ("COVID-19").  *See* ECF No. 11.  Respondents oppose the Motion.  *See* ECF No. 15. Having carefully reviewed the parties' submissions and examined the applicable law, the Court now grants the Petition insofar as it seeks a Preliminary Injunction requiring Petitioner's release, and orders Respondents to immediately release Petitioner subject to conditions set forth in the accompanying Order

## I.      FACTUAL BACKGROUND

### a.   Petitioner's Immigration and Criminal History

Petitioner is a twenty-one year old native and citizen of Honduras who entered the United States of America as a minor without being inspected, admitted or paroled by an immigration official.  ECF No. 15-8, Notice to Appear dated Oct. 15, 2013.  On October 7, 2013, the United States Border Patrol encountered Petitioner as a juvenile in Texas and served upon him a Notice to Appear, placing him in removal proceedings pursuant to section 2l2(a)(6)(A)(i) of the Immigration and Nationality Act.  *Id.*  Petitioner was then transferred to the custody of the Office of Refugee Resettlement and released on an Order of Recognizance on December 10, 2013.  ECF No. 15-9, ICE Bond Denial Letter dated Apr. 29, 2020.

On or about September 22, 2019, Petitioner was arrested by the Newark Police Department and charged with second degree robbery with infliction of bodily injury or use of force, and conspiracy to commit robbery, pursuant to N.J.S.A. 2C:15-1(a) and N.J.S.A. 2C:5-2(a)(1).  *See* ECF No. 15-10, Judgment of Conviction ("JOC").  On September 24, 2019, Enforcement Removal Officers lodged an immigration detainer against Petitioner.  ECF No. 15-11, Custody Determination.  On October 25, 2019, Petitioner was transferred to ICE custody at ECCF pending his removal proceedings, and he is detained pursuant to 8 U.S.C. § 1226(a).  *Id.*

On November 14, 2019, Petitioner was afforded a bond hearing, after which the Immigration Judge denied bond finding that Petitioner is a risk of flight and danger to the community.  ECF No. 15-12, IJ Bond Denial Order.  On December 19, 2019, the state court robbery charges were dismissed, and Petitioner pled guilty to disorderly conduct-improper behavior, pursuant to N.J.S.A. 2C:33-2(a)(1), a petty disorderly person's offense; he received no

jail time, a $125.00 fine, and a no contact order for the address in Newark, New Jersey where the offense occurred.[1]  *See* JOC.

### b.  The COVID-19 Health Crisis

On March 11, 2020, the World Health Organization ("WHO") classified COVID-19 as a global pandemic, anticipating that "the number of cases, the number of deaths, and the number of affected countries" would increase.[2]  Around that time, the United States had reported only approximately 1,000 cases of COVID-19.[3]  As of July 13, 2020, that number has risen to over 3.3 million and the virus has taken 135,324 lives nationally.[4]  New Jersey alone has reported a total of 177,469 cases and 15,560 deaths as of July 7, 2020.[5]  Essex County, where Petitioner is detained, currently has the third highest number of total cases and the highest number of COVID-19 deaths in the state, with 19,288 cases and 2077 deaths as of July 13, 2020.[6]

According to the Centers for Disease Control and Prevention (the "CDC"), COVID-19 spreads "mainly from person-to-person" between those "who are in close contact with one another (within about 6 feet)" and possibly when people touch contaminated surfaces and then touch their

---

[1] In his Declaration, Petitioner asserts that he went with his brother and a few friends to the park and ended up getting arrested alongside them; although he wanted to exonerate himself, he pleaded guilty to the reduced charges to resolve the matter and focus on his petition for immigration relief.  ECF No. 1-8, Petitioner's Decl. ¶¶ 8-9.

[2] World Health Org., *WHO Director-General's Opening Remarks at the Media Briefing on COVID-19 – March 2020* (Mar. 11, 2020), https://www.who.int/dg/speeches/detail/who-director-general-s-opening-remarks-at-the-media-briefing-on-covid-19---11-march-2020.

[3] *Coronavirus Case Total Climbs in New York*, THE NEW YORK TIMES (Mar. 11, 2020) https://www.nytimes.com/2020/03/11/nyregion/coronavirus-new-york-update.html.

[4] *Coronavirus in the U.S.: Latest Map and Case Count,* THE NEW YORK TIMES, https://www.nytimes.com/interactive/2020/us/coronavirus-us-cases.html, (last visited Jul. 13, 2020).

[5] *New Jersey Coronavirus Map and Case Count*, THE NEW YORK TIMES, https://www.nytimes.com/interactive/2020/us/new-jersey-coronavirus-cases.html, (last visited Jul. 13, 2020).

[6] *Id.*, https://www.nytimes.com/interactive/2020/us/new-jersey-coronavirus-cases.html#county (last visited Jul. 13, 2020.

mouths, noses, or eyes.[7]  Common symptoms of COVID-19 include fever, cough, and shortness of breath.[8]

Experts still have much to learn about how the virus spreads.  In early April, the CDC director, Dr. Robert Redfield, in an interview with National Public Radio affiliate WABE, stated that "a significant number of individuals that are infected actually remain asymptomatic.  That may be as many as 25 percent[,]" and this is important because asymptomatic individuals contribute to the transmission of the virus.[9]  The CDC currently estimates that 40% infections are asymptomatic, and the chance of transmission from people with no symptoms is 75 percent.[10]  Furthermore, those who become symptomatic can likely transmit the virus up to 48 hours before they show symptoms.[11]  These asymptomatic transmitters and individuals who are transmitting the virus before they become symptomatic help explain how rapidly the virus can spread.[12]

Symptoms of COVID-19 can be mild, and "[a]nyone can have mild to severe symptoms."[13]  As explained by the CDC, "[s]ome people are more likely than others to become severely ill, which means that they may require hospitalization, intensive care, or a ventilator to help them breathe, or

---

[7] Ctrs. for Disease Control and Prevention, *How COVID-19 Spreads*, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-covid-spreads.html (last visited Jun. 17, 2020).

[8] Ctrs. for Disease Control and Prevention, *Symptoms of Coronavirus*, https://www.cdc.gov/coronavirus/2019-ncov/symptoms-testing/symptoms.html (last visited Jun. 17, 2020).

[9] *CDC Director On Models For The Months To Come: 'This Virus Is Going To Be With Us'*, NPR, https://www.npr.org/sections/health-shots/2020/03/31/824155179/cdc-director-on-models-for-the-months-to-come-this-virus-is-going-to-be-with-us; *see also* Apoora Mandavilli, Infected but Feeling Fine: The Unwitting Corona-virus Spreaders, N.Y. Times (Mar. 31, 2020), https://www.nytimes.com/2020/03/31/health/coronavirus-asymptomatic-transmission.html.

[10] Ctrs. for Disease Control and Prevention, COVID-19 Pandemic Planning Scenarios, https://www.cdc.gov/coronavirus/2019-ncov/hcp/planning-scenarios.html (last visited Jul. 13, 2020).

[11] *See supra* note 9.

[12] *Id.* The CDC also states in its guidance that "COVID-19 may be spread by people who are not showing symptoms." Ctrs. for Disease Control and Prevention, *How COVID-19 Spreads*, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-covid-spreads.html (last visited Jun. 17, 2020).

[13] Ctrs. For Disease Control and Prevention, *Symptoms of Coronavirus*, https://www.cdc.gov/coronavirus/2019-ncov/symptoms-testing/symptoms.html (last visited Jun. 17, 2020).

they may even die."[14]  Among them are persons who are those over the age of 65 and people of any age with certain underlying health conditions such as serious heart conditions, diabetes, chronic kidney disease, chronic obstructive pulmonary disease, obesity, and moderate to severe asthma ("CDC Risk Factors").[15]  The CDC now advises that certain populations may also be at higher risk of contracting COVID-19 or developing severe symptoms, including those in long-term care facilities, those with disabilities or behavioral disorders, members of racial or ethnic minority groups, pregnant women, and those who are homeless.[16]

There is presently no vaccine to prevent COVID-19 infections.[17]  The CDC and health experts thus emphasize the importance of "social distancing" (i.e. staying at least six feet apart), regularly disinfecting "high touch" surfaces, and wearing a cloth face covering to curtail the spread of the virus.[18]  Ultimately, "[t]he best way to prevent illness is to avoid being exposed to this virus."[19]

But in truth, avoiding exposure to COVID-19 is impossible for most detainees and inmates in correctional facilities, and detainees who meet the CDC's criteria for "higher risk" are the most vulnerable to a detention facility's shortcomings.  In its guidance for correctional facilities, the

---

[14] Ctrs. for Disease Control and Prevention, *People Who Are at Higher Risk for Severe Illness*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html (last visited Jun. 26, 2020).

[15] On June 25, 2020, the CDC updated its guidance to include additional medical risk factors, reflecting available data as of May 29, 2020.  Ctrs. For Disease Control and Prevention, *People of Any Age with Underlying Medical Conditions*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fneed-extra-precautions%2Fgroups-at-higher-risk.html (last visited June 26, 2020).

[16] Ctrs. for Disease Control and Prevention, *People Who Need to Take Extra Precautions*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/index.html (last visited June 26, 2020).

[17] Ctrs. for Disease Control and Prevention, *Prevent Getting Sick*, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/index.html (last visited June 25, 2020).

[18] Ctrs. for Disease Control and Prevention, *supra* note 12.

[19] *Id.*

CDC has explained that, among other things, the crowded and fluid nature of detention facilities, the inadequate hygienic supplies, and the limited options for medical isolation present "unique challenges for control of COVID-19 transmission among incarcerated/detained persons, staff, and visitors." *See* ECF No. 15-1, CDC March 2020 Interim Guidance ("CDC Interim Guidance") at 2. Consequently, practicing social distancing and ensuring proper hygiene to minimize the risk of infection are exceedingly difficult, and the CDC Interim Guidance recommends extensive testing, cleaning and quarantining procedures to contain the spread of infection. *Id.*

### c. Petitioner's Medical Conditions

Petitioner has provided the Declaration of Dr. Kim Strong Griswold, ECF No. 1-2 ("Griswold Decl."), an expert in analyzing the medical needs of asylum seekers detained by ICE.[20] Dr. Griswold opines that Petitioner is at high risk of serious illness or death from COVID-19 due to his reported history as a heavy smoker; prior to his detention in October of 2019, Petitioner reports that he was smoking between a half of a pack of cigarettes to a full pack and a half of cigarettes a day. *Id.* ¶ 17; *see also* Petitioner's Decl. ¶ 3. Petitioner's reported history of heavy smoking is also supported by his medical records at ECCF. *See* ECF No. 2, Petitioner's Medical Records. Dr. Griswold opines that "smoking causes damage to the respiratory system which could increase [Petitioner's] chance of a negative outcome should he come in contact with COVID-19" and cites to evidence suggesting that smoking is associated with adverse outcomes in COVID-19, including death. *Id.* According to his medical expert, Petitioner may be at even higher risk due to the altered immunity cigarette smoking may produce; smoking may lead to immunosuppression by affecting respiratory epithelium and lung surfactant. *Id.* ¶ 18. In her Supplemental Declaration

---

[20] Dr. Griswold reviewed Petitioner's medical records from Essex County Correctional Facility, including records from September 23, 2019 to March 27, 2020, Petitioner declaration dated April 29, 2020, a clinical interview completed by Dr. Mark P. Kurzrok, dated February 12, 2020, the declaration of Dr. Homer Venters, MD, dated May 2, 2020, and the declaration of Rosa Santana, dated May 3, 2020. *Id.* ¶ 7.

("Suppl. Griswold Decl."), Dr. Griswold further opines that "[e]ven if [Petitioner] stopped smoking when he was detained by ICE in October of 2019, the fact that he smoked heavily for at least two years places him at higher risk of adverse outcomes if he contracts COVID-19." *Id.* ¶ 4. Based on available data, the CDC currently advises that "[b]eing a current or former cigarette smoker may increase your risk of severe illness from COVID-19."[21]

In addition to his history as a former heavy smoker, Petitioner also reports that he has latent tuberculosis. Petitioner's Decl. ¶ 3; ECF No. 20, Declaration of Karol Trujillo ¶¶ 2-3. According to his medical expert, ECCF's medical records suggest that ECCF administered a "purified protein derivative" (PPD) test, the result of which indicated that Petitioner has latent tuberculosis.[22] *See* Supp. Griswold Decl. ¶ 11. That diagnosis is consistent with Petitioner's other medical history, which reflects that he was unable to complete the treatment prescribed after his prior tuberculosis diagnosis, and Dr. Griswold opines that Petitioner "very likely still has latent tuberculosis." *Id.* ¶ 10; *see also* Trujillo Decl. ¶ 3. In her medical opinion, Dr. Griswold further explains that Petitioner is at increased risk of serious complications from COVID-19, particularly because the disease could activate his tuberculosis. *Id.* ¶ 12.

In addition to the health risks presented by his history of heavy smoking and latent tuberculosis, Petitioner's also reportedly suffers from PTSD symptoms. Petitioner's Decl. ¶ 3; *see also* ECF No. 19, Letter from Jonnelle Rodriguez, LSW, dated May 20, 2020. Dr. Griswold opines that Petitioner's diminished mental health makes him more vulnerable to serious health

---

[21] Ctrs. for Disease Control and Prevention, *People of Any Age with Underlying Medical Conditions*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fneed-extra-precautions%2Fgroups-at-higher-risk.html#smoking (last visited Jul. 14, 2020).

[22] Respondents point out that Petitioner "received a chest x-ray that was negative for [tuberculosis]," Resp't Br. at 24, but Petitioner's medical expert explains that a negative chest x-ray indicates only that he does not have active tuberculosis, not that he has cleared his latent tuberculosis from a previous infection. Suppl. Griswold Decl. ¶ 11.

complications because it undermines his immune system, and she explains that PTSD has been linked to immune dysregulation, and may pose an additional risk for Petitioner if he contracts COVID-19. *Id.* ¶ 19.

Ultimately, Dr. Griswold opines that Petitioner's constellation of medical and mental conditions place him at a high risk of serious illness or death from COVID-19, and the only way to adequately protect him from that risk is for him to be released. *Id.* ¶ 21.

### d.  ECCF's Protocols to Address COVID-19

ECCF has established protocols to address COVID-19 in its Facility, *see* ECF No. 15-5, Seventh Amended Declaration of Alfaro Ortiz ("Ortiz Decl.") dated May 11, 2020, which are summarized below.

#### i.  External Influences

As of March 26, 2020, ECCF suspended the acceptance of new ICE detainees other than those who "roll over" from county custody, and detainees and inmates are subject to medical evaluations before entering.  Ortiz Decl. ¶ 11; 19.j.  On June 30, 2020, Petitioner's counsel wrote to inform the Court that ECCF recently announced that it plans to resume admissions of new ICE detainees into the facility.  *See* ECF No. 28.  Respondents have neither verified nor denied that they are accepting new ICE detainees.  ECCF has also disallowed visitation from outside volunteers and family and friends, and only "window" visits, telephone calls, and video conferencing with attorneys are permitted.  *Id.* ¶¶ 19.a, 19.l, 19.n.

#### ii.  Social Distancing & Cleaning

ECCF houses ICE detainees and inmates in separate buildings, and are operating at approximately 68% capacity.  *Id.* ¶¶ 3-4.  The dorms at ECCF were originally configured to house 60 detainees per pod, but have been reduced to a maximum of 48 detainees.  *Id.* ¶ 5.  7.  The cells

in the buildings have two beds each that are set up as bunk beds. *Id.* ¶ 6. There are bunks around the perimeter of each dorm, and in the center, there is a seating area and recreation yard. *Id.* Based on the design in the dorms, the bunk beds are <u>not</u> spaced six or more feet from one another, as the beds are bolted to the ground, but where feasible beds are skipped or detainees sleep head to foot. *See* id. ¶¶ 7-8. The housing units are equipped with air circulation systems that circulate fresh air throughout the day. *Id.* ¶ 17.

ECCF has "modified inmate and detainee recreation groups to limit close interaction with other inmates and detainees [and] [r]educed the number of inmates having recreation at the same time by one half to foster social distancing." Ortiz Decl. ¶ 20.e.iii. Staff sanitizes the housing units at least three times per day and the kitchen every hour. *Id*. ¶¶ 19m., 19.i.iv. Inmates and detainees eat their meals in their pods or in passive recreation areas. *Id.* ¶ 19.j. Staff is provided alcohol-based hand sanitizer, but for safety reasons, the Facility does not provide hand sanitizer to detainees or inmates, and detainees and inmates instead have "free access" to soap. *Id.* ¶ 24. As of May 1, 2020, the Facility does not have any shortage of PPE and cleaning supplies. *Id.* ¶ 25. The protocol requires that "common spaces and equipment are sanitized regularly[]" and that shared items such as telephones, tablets, and toilets are cleaned between uses by designated detainee or inmate workers, who are supervised by ECCF staff. *Id.* ¶ 26; *see also id.* ¶¶ 41-42. Cleaning agents are available in the showers for detainees and inmates to clean those areas themselves between uses. *Id.*

### iii.    Medical Response, Quarantine & Isolation

All staff members are provided with surgical masks, gloves, and safety goggles when they report to work, and are required to wear the mask. *Id.* ¶ 21. Detainees and inmates are provided

masks if they exhibit symptoms consistent with COVID-19, and detainees and inmates who perform facility cleaning or work detail are provided gloves.[23]  *Id.* ¶ 22.

Confirmed cases that do not require hospitalization are isolated in a designated area.  Ortiz Decl. ¶ 30.  Symptomatic inmates or detainees who are awaiting test results are "evaluated by the medical severity," are started on antiviral medications, and have their vitals monitored on a daily basis.  *Id.* ¶ 31.  Finally, those who are asymptomatic but "have had a known exposure" to a confirmed COVID-19 case are "cohorted" together with restrictive movement for a fourteen-day period. *Id.* ¶ 33.  Cohorting ends if no new COVID-19 case develops within that period.  *Id.*

ECCF also has on-site medical personnel who are available 24/7.  Ortiz Decl. ¶ 13.  Detainees and inmates at the Facility are able to make daily sick calls to on-site medical staff.  *Id.* ¶ 28.  If detainees or inmates complain of illness, medical staff evaluates them.  *Id.*  At ECCF, detainees and inmates with moderate to severe symptoms of COVID-19 may be transported to a hospital for evaluation and diagnostic testing.  *Id.* ¶ 29.  ECCF also houses inmates and detainees with high-risk health conditions, as identified by the CDC, separately if their conditions are not well-controlled, and the correctional officers who work with those individuals use full PPE.  *Id.* ¶¶ 47-48.

As part of ECCF's containment and quarantine strategy, the Facility is in the process of testing its entire population using rapid testing antibody screening.[24]  Ortiz Decl. ¶ 45.  ECCF is housing inmates and detainees based on the results of the antibody screening, and if a detainee or inmate in a housing unit shows symptoms of COVID-19 or tests positive for COVID-19, then

---

[23] N95 masks are reserved for higher risk situations.  *Id.* ¶ 23.

[24] According to Respondents, Petitioner has been tested with the rapid antibody test, and has tested negative.  Opposition Brief at 9.  ICE does not take a position on the accuracy or validity of the rapid testing underway at ECCF, *see id.*, but Petitioner contends that the antibody tests conducted by ECCF are unreliable.  Petition ¶¶ 40, 41.

ECCF will perform antibody testing on all other detainees or inmates who were housed with that individual.  Ortiz Decl. ¶¶ 46.

As of July 13, 2020, the ICE website reports that there are 6 confirmed cases among detainees currently under isolation or monitoring at ECCF and 8 total cases among ICE detainees.[25]  According to the Eleventh Amended Declaration of Warden Ortiz, as of June 7, 2020, ECCF has identified the following cases of COVID-19, confirmed by laboratory testing, amongst ECCF inmates, detainees, and staff: (a) 8 ICE detainees, there were no new positive test results since [the prior] week; (b) 3 county inmates one of whom is currently housed at ECCF, the other 2 have been released, there was 1 positive test result since [the prior] week ; (c) a cumulative total of 17 county inmates at Delaney Hall; six of those inmates are no longer in custody. . .(d) 90 members of the ECCF correctional staff, 80 of whom have been cleared and returned to work, there were 2 new positive results since [the prior] week; and (e) four members of the civilian staff, three of whom have been cleared and returned to work, there were no new positive results since [the prior] week."[26]  *See Amiron D. v. Tsoukaris*, Civ. Act. No. 20-6608, ECF No. 9-5, Eleventh Amended Decl. of Alfaro Ortiz at ¶ 44.

### e.  Petitioner's Experiences at ECCF

Petitioner's experiences at ECCF highlight gaps in the Facility's protocols.  Petitioner reports that he participated in a hunger strike in March 2020 because detainees lacked access to sanitary living conditions, did not have soap or hand sanitizer, and the guards wore no PPE.  Petitioner's Decl. ¶ 13.  Petitioner acknowledges that ECCF has since taken some precautions in order to contain the spread of the disease, but he reports that "not every guard follows appropriate

---

[25] *Ice Detainee Statistics*, https://www.ice.gov/coronavirus (last visited Jul. 15, 2020).

[26] All staff who were in proximity of those testing positive were either sent home to self-quarantine for the recommended 14-day time period, or to the hospital for further treatment.  It is not clear if detainees who were in proximity to those testing positive were also quarantined.

sanitation protocols" and detainees lack access to hand sanitizer or bleach to sanitize their living spaces, and he is unable to wash his hand regularly due to restrictions on movements. *Id.* He also reports that detainees still "live in close quarters with one another and are constantly sharing surfaces that are not cleaned." *Id.*

Petitioner further reports that he is malnourished and that the pre-made meals are inedible, and often expired, and he feels himself "getting weaker." *Id.* ¶ 14. Petitioner is unable to supplement his diet with food items through commissary due to delays in orders, which can take up to a month to arrive. *Id.* ¶ 15.

Petitioner also reports that if detainees are sick but do not have the coronavirus, they are not given their medication, and, when detainees inquire about medical issues, they are just told to write it on the tablet.[27] *Id.* ¶ 16. Petitioner reports that "more and more people are getting sick" around him, and that "ECCF moves detainees between different areas of the facility to contain the virus, but regardless of where they put us, people are sick." *Id.* ¶ 19.

Although Petitioner's immigration case is still moving forward, he does not have access to the law library and is unable to make copies or access vital information he need to understand what is happening in his case. *Id.* ¶ 17. In addition, on April 8, 2020, Petitioner was scheduled for his final individual merits hearing but he and his attorney were not able to prepare because they were limited to a fifteen-minute phone calls in an open area with no privacy. *Id.* ¶ 20. The immigration court closed on the day of Petitioner's hearing, and his individual hearing has not been rescheduled. *Id.*

---

[27] He reports that grievances similarly go unanswered for long periods of time. *Id.* ¶ 18.

## II.   <u>STANDARD OF REVIEW</u>

Under 28 U.S.C. § 2241, a district court may exercise jurisdiction over a habeas petition when the petitioner is in custody and alleges that his custody violates the constitution, laws, or treaties of the United States.  28 U.S.C. § 2241(c); *Maleng v. Cook*, 490 U.S. 488, 490 (1989). A petitioner may seek Section 2241 relief only in the district in which he is in custody.  *United States v. Figueroa*, 349 F. App'x 727, 730 (3d Cir. 2009).  Here, Petitioner is detained within this district and alleges that his continued detention violates the Due Process Clause of the Fifth Amendment.

Petitioner has filed a motion for a TRO seeking his immediate release from detention, which the Court construes as a request for a preliminary injunction.  *See Hope v. Warden York County Prison*, 2020 WL 1922372, at *2-4 (3d Cir. Apr. 21, 2020).  Motions for temporary and preliminary injunctive relief are governed by a four-factor test.  The movant must, as a threshold matter, establish the two "most critical" factors: likelihood of success on the merits and irreparable harm.  *Reilly v. City of Harrisburg*, 858 F.3d 173, 179 (3d Cir. 2017).  If these "gateway factors" are satisfied, the Court considers the third and fourth factors, which aim to balance the equities by examining the potential for harm to others if relief is granted and whether the public interest favors injunctive relief.  *Id.* at 176, 179.  The Court must then balance all four factors to determine, in its discretion, whether the circumstances warrant injunctive relief.  *Id.* at 179.

The Court also considers whether Petitioner has established extraordinary circumstances justifying his release.  *See Lucas v. Hadden*, 790 F.2d 365 (3d Cir. 1986); *Landin v. Rafferty*, 970 F.2d 1230, 1239 (3d Cir. 1992) (indicating that a court may only grant release pending a disposition of federal habeas claims when the petitioner has raised "substantial constitutional claims upon which he has a high probability of success, and . . . when extraordinary or exceptional

circumstances exist which make the grant of bail necessary to make the habeas remedy effective")
(citation omitted)); *see also In re Soule's*, 688 F. App'x 134, 135-36 (3d Cir. 2017).

## III.   DISCUSSION

### a. Threshold Jurisdictional Arguments

Courts in this district and in neighboring districts have, in the last several months, released
ICE detainees who are similarly situated to Petitioner, *see, e.g., Cristian A.R. v. Decker*, No. 20-
3600, ECF No. 26 (D.N.J. April 12, 2020) (finding that the protocols in place at Bergen and
Hudson County Jails did not adequately protect medically vulnerable detainees and holding that
continued detention such detainees during COVID-19 pandemic amounted to punishment under
the Fifth Amendment), including detainees at ECCF.  *See Jose B.R. v. Tsoukaris*, No. 20-3347,
2020 WL 2744586 (D.N.J. May 27, 2020) (granting release of detainee suffering from mental
illness from ECCF on conditions of confinement and extraordinary circumstances grounds);
*Rafael L.O.  v. Tsoukaris*, No. 20-3481, ECF No. 25 (D.N.J. April 9, 2020) (releasing detainees at
ECCF); *see also Thakker v. Doll*, No. 20-480, 2020 WL 1671563  (M.D. Pa. Mar. 31, 2020);
*Jeferson V. G. v. Decker*, No. 20-3644, 2020 WL 1873018 (D.N.J. Apr. 15, 2020); *Marvin A. G.
v. Decker*, No. 20-1689 (D.N.J. Apr. 14, 2020); *Kevin M.A. v. Decker*, No. 20-4593, 2020 WL
2092791, at *10 (D.N.J. May 1, 2020).

Nevertheless, in their opposition brief, the Government now argues that the Court lacks
subject matter jurisdiction to consider Petitioner's claims under § 2241 because Petitioner's claims
relate to his conditions of confinement, which are typically brought in a civil rights suit.  The
Government further argues that, even if the Court does have habeas jurisdiction, release is not the

proper remedy; instead, the remedy should be a change in the allegedly unconstitutional conditions.  Opp. Brief at 16-19.

Under 28 U.S.C. § 2241, a district court may exercise jurisdiction over a habeas petition when the petitioner is in custody and alleges that his custody violates the Constitution, laws, or treaties of the United States.  *See* 28 U.S.C. § 2241(c); *Maleng v. Cook*, 490 U.S. 488, 490 (1989). Petitioner asserts that his conditions of confinement at ECCF violate the substantive Due Process Clause of the Fifth Amendment and amount to unlawful punishment that threatens his health and life, and he seeks immediate release from immigration detention.

Typically, challenges to conditions of confinement by state and federal prisoners or detainees are brought in federal court pursuant to 42 U.S.C. § 1983 and *Bivens v. Six Unknown Named Agents*, 403 U.S. 388 (1971).  *See, e.g., Camacho Lopez v. Lowe*, No. 20-0563, 2020 WL 1689874, at *4–6 (M.D. Pa. Apr. 7, 2020).  Where an individual seeks "immediate or more speedy release," from detention, however, he or she is asserting a remedy that is only available through a habeas petition.  *See Preiser v. Rodriguez*, 411 U.S. 475, 494 (1973); *see also Camacho Lopez*, 2020 WL 1689874, at *4 ("[Petitioner] seeks immediate release from custody based on what he perceives to be constitutionally deficient conditions of confinement that threaten his health and life.  This is unequivocally a habeas remedy.").  A habeas petition is the vehicle through which an individual may challenge the "fact or length" of confinement.[28]  *See Preiser*, 411 U.S. at 494. Although Petitioner brings a claim traditionally asserted through a civil rights complaint, he seeks

---

[28] In *Preiser*, the Supreme Court addressed the scope of relief state prisoners may seek under the federal civil rights statute, 42 U.S.C. § 1983, and held that when a challenge falls within the "heart of habeas corpus," *id.* at 498, state prisoners may not proceed by way of a section 1983 action, as otherwise they could evade the exhaustion and other procedural requirements established for state habeas challenges in the federal courts. *Id.* at 489–90. Claims that fall within the "heart" or "core" of habeas corpus, and thus may be brought in federal court solely by means of a petition for the writ, are those in which a prisoner "challeng[es] the very fact or duration of his physical imprisonment." *Id.* at 500. The Court, however, did not hold that the converse is also true—that is, that any claim challenging something apart from the fact or duration of confinement may <u>not</u> be raised in habeas. *See Aamer v. Obama* 742 F.3d 1023, 1031–32 (D.C.C. 2014) (explaining same).

immediate release from ICE custody, which is a remedy that is only available through a habeas petition. *See, e.g., Preiser*, 411 U.S. at 494; *Leamer v. Fauver*, 288 F.3d 532, 540 (3d Cir. 2002); *Camacho Lopez*, 2020 WL 1689874, at \*4 (citing *Preiser*, 411 U.S. at 500) ("When a petitioner seeks immediate release from custody, the 'sole federal remedy' lies in habeas corpus"); *Marvin A.G. v. Decker*, 2020 WL 3481746, at \*2 (D.N.J., 2020) (same).

Neither the Third Circuit nor Supreme Court has definitively addressed whether civil detainees may bring conditions of confinement claims in a habeas corpus petition. *See Camacho Lopez*, 2020 WL 1689874, at \*5. The Supreme Court has repeatedly left open the question of whether detainees may challenge their confinement conditions via a petition for a writ of habeas corpus. *See Bell v. Wolfish*, 441 U.S. 520, 526, n.6, (1979) ("[W]e leave to another day the question of the propriety of using a writ of habeas corpus to obtain review of the conditions of confinement."); *Preiser*, 411 U.S. at 499 ("When a prisoner is put under additional and unconstitutional restraints during his lawful custody, it is arguable that habeas corpus will lie to remove the restraints making custody illegal."); *Ziglar v. Abbasi*, ––– U.S. ––––, 137 S.Ct. 1843, 1862-63 (2017) (explaining that the habeas remedy, if necessity required its use, would have provided a faster and more direct route to relief for immigration detainees challenging a detention policy than a suit for money damages, as a successful habeas petition would have required officials to place respondents in less-restrictive conditions immediately). Similarly, the Third Circuit has alluded to a "habeas attack on the conditions of confinement," which would be "cognizable in a federal habeas action only in extreme cases." *Ali v. Gibson*, 572 F.2d 971, 975 n.8 (3d Cir. 1978).[29]

---

[29] In § 2241 petitions brought by convicted federal inmates, the Third Circuit distinguishes between those petitions that implicate the execution of the federal inmate's sentence, *see Woodall v. Fed. Bureau of Prisons*, 432 F.3d 235, 242-44 (3d Cir. 2005) (holding that federal inmate's challenge to BOP regulation limiting his placement in community confinement goes to the execution of his sentence and thus can be brought via § 2241); *McGee v. Martinez*, 627 F. 3d 933, 934 (3d Cir. 2010) (challenge to Inmate Financial Responsibility Plan ("IFRP") is a means to execute a sentence and cognizable under § 2241), and those challenges that strictly implicate conditions of confinement, which are properly brought as *Bivens* actions. *See Cardona v. Bledsoe*, 681 F. 3d 533, 534 (3d Cir.

Likewise, recent COVID-19 decisions within this Circuit have rejected the government's arguments that habeas should not be extended to such claims.[30]  *See Alirio R.R. v. Correia*, No 20-6217, 2020 WL 3249109, at *9 (D.N.J. Jun. 15, 2020) (rejecting respondents' argument that the Court lacked subject matter jurisdiction over petitioner's claims under § 2241); *Jose M. C. v. Tsoukaris*, No. 20-6236, 2020 WL 3249097, at *5 (D.N.J. Jun. 16, 2020) (same).

These courts also determined that, in light of the extraordinary circumstances posed by the global pandemic, release via temporary restraining orders or preliminary injunctions was the proper remedy for immigration detainees whose conditions of confinement were found to be unduly punitive in light of their underlying medical conditions.  *See Jose M.C.*, 2020 WL 3249097, at *5 (collecting cases).  This Court likewise finds that Petitioner may pursue his due process claims through the instant petition for writ of habeas corpus and may seek a preliminary injunction directing his release under reasonable conditions as a remedy.

### b.  Petitioner's Substantive Claims for Relief

As to the merits of Petitioner's claims, the Government argues that he cannot meet the TRO or preliminary injunction standards because he is lawfully detained under § 1226(a)[31] and because

---

2012) (action challenging the BOP's decision to place him in the Special Management Unit ("SMU") does not implicate the execution of inmate's sentence and thus properly brought as a *Bivens* action).  The Court is not persuaded that this line of cases is dispositive here, as Petitioner is not a convicted prisoner serving a federal sentence, and, thus this distinction appears inapplicable to civil detainees.

[30] Just last week, in *German Santos v. Warden Pike County Correctional Facility*, __ F.3d __, 2020 WL 3722955, at *6 (3d Cir. Jul. 7, 2020), the Third Circuit held that whether an immigration detainee's "conditions of confinement are 'meaningfully different[ ]' from criminal punishment[]' is a factor in determining whether his or her detention has become unreasonably prolonged" under 8 U.S.C. § 1226(c) (quoting and reaffirming the constitutional holding of *Chavez-Alvarez v. Warden York Cty. Prison*, 783 F.3d 469, 478 (3d Cir. 2015) and explaining that "if an alien's civil detention under § 1226(c) looks penal, that tilts the scales toward finding the detention unreasonable").  Thus, at the very least, the Third Circuit permits consideration of detainee's conditions of confinement in analyzing whether habeas relief is warranted.

[31] Petitioner does not argue that 8 U.S.C. § 1226(c) is unconstitutional as applied to him, and the Court does not address this argument, which misconstrues the basis of Petitioner's claims for relief.

ECCF has taken sufficient precautions against COVID-19 and has met Petitioner's medical needs. Opposition Brief at 21-27.

Recent decisions in this District have established the legal backdrop governing conditions of confinement claims brought by civil detainees. *See, e.g., Cristian A.R.*, 2020 WL 2092616, at *9-10; *Rafael L.O.*, 2020 WL 1808843, at * 6-7. Civil detainees are entitled to due process and may bring conditions of confinement claims under the Due Process Clause of the Fifth (or Fourteenth) Amendment as opposed to the Eighth Amendment. *See Bell*, 441 U.S. at 535-36; E*.D. v. Sharkey*, 928 F.3d 299, 306-07 (3d Cir. 2019). The Fifth and Fourteenth Amendments protect civil detainees like Petitioner from all—*not just "cruel and unusual"*—punishment. *See Hubbard v. Taylor*, 399 F.3d 150, 166-67 (3d Cir. 2005).

To determine whether Petitioner's conditions of confinement constitute punishment, the Court asks whether the challenged conditions are reasonably related to a legitimate governmental objective, and if they are not, it may infer "'that the purpose of the governmental action is punishment that may not be constitutionally inflicted upon detainees qua detainees.'" *E.D. v. Sharkey*, 928 F.3d 299 307 (3d Cir. 2019) (quoting *Hubbard v. Taylor*, 538 F.3d 229, 232 (3d Cir. 2008)). A condition or deprivation amounts to punishment if there is "an expressed intent to punish on the part of detention facility officials"; no "alternative purpose to which [the condition or deprivation] may rationally be connected is assignable for it"; or the condition or deprivation is "excessive in relation to the alternative purpose assigned [to it]." *See Bell*, 441 U.S. at 538 (quoting *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 168-69 (1963)). The Court considers "the totality of the circumstances within an institution" to determine whether given conditions constitute punishment. *Hubbard*, 399 F.3d at 160 (internal quotation marks and citation omitted). Civil detainees, like inmates, may be entitled to relief if they prove threats to personal safety from

exposure to serious contagious diseases.  *See Cristian A.R.*, 2020 WL 2092616, at *9 (citing *Helling v. McKinney*, 509 U.S. 25, 32 (1993)).

Here, after considering the totality of the circumstances, including improvements made at ECCF since the Court decided *Jose B.R.*, the Court finds that Respondents' increased efforts to combat the spread of COVID-19, while laudable, fall short of protecting the most vulnerable detainees at the Facility.  As the Court previously found in *Jose B.R.*, ECCF's dormitory-style pods makes social distancing exceedingly difficult, and, while ECCF has implemented social distancing and sanitation protocols, Respondents do not explain how ECCF ensures those policies are enforced.[32]  *See Jose B.R.*, 2020 WL 2744586, at *10.  Furthermore, even if the Court credits the improved protocols, Respondents do not consider Petitioner to be high risk for COVID-19 complications, despite his history of heavy smoking, latent T.B., and PTSD, and thus do not provide him the additional protections it affords those detainees it does deem high risk.[33]  *See* Ortiz Decl. ¶¶ 47-48.

Because Petitioner's conditions of confinement are not meaningfully distinguishable from the petitioner's circumstances in *Jose B.R.*, the Court finds that Petitioner has shown a likelihood of success on the merits of his claim that his detention amounts to punishment in light of his particular vulnerabilities.

For the same reasons, the Court finds that Petitioner is "more likely than not" to suffer irreparable harm absent the requested relief, *see Reilly*, 858 F.3d at 179, and Petitioner need not wait until his health or life are impaired to seek relief.  As the Supreme Court observed in *Helling*,

---

[32] Respondents provide no information regarding ECCF's enforcement of its sanitation, social distancing, and PPE protocols, such as spot checks, and suggest that the mere existence of the protocols is sufficient to show that these protocols are routinely followed by staff and detainees alike.

[33] At ECCF, individual are designated high risk only if they have a CDC Risk Factor that is not well controlled. Ortiz Decl. ¶¶ 47-48.

"it would be odd to deny an injunction to inmates who plainly proved an unsafe, life-threatening condition in their prison on the ground that nothing yet had happened to them."  509 U.S. at 33 (noting that "the Courts of Appeals have plainly recognized that a remedy for unsafe conditions need not await a tragic event").

That brings the Court to the balancing of the equities and the public interest. "Before granting an injunction, a district court must balance the relative harm to the parties, i.e., the potential injury to the plaintiff if an injunction does not issue versus the potential injury to the defendant if the injunction is issued." *Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharmaceuticals Co*., 290 F.3d 578, 596 (3d Cir. 2002) (internal citation omitted).  In *Cristian A.R*., the Court found the potential of injury to petitioners to be high and also found that the public interest supported the release of Petitioners before they contract COVID-19 to preserve critical medical resources and prevent further stress on the states' and country's already overburdened healthcare systems.  *See* 2020 WL 2092616, at *13 (citing *Rafael L.O.*, 2020 WL 1808843, at *9).  The same is true here, albeit to a lesser extent, as hospitalizations in New Jersey have declined in the two months since the Court issued its decision in *Cristian A.R.*[34]

Respondents also have a legitimate interest in ensuring that Petitioner does not flee and in protecting the public.  As Judge Vasquez found in *Rafael L.O.* and this Court found in *Cristian A.R.*, those very important interests are adequately addressed here by fashioning appropriate conditions of release.  *See Cristian A.R.*, 2020 WL 2092616, at *13.  Although Petitioner was charged with robbery and related offenses, the robbery charges were dismissed on December 19, 2019, and Petitioner pleaded guilty to disorderly conduct-improper behavior, pursuant to N.J.S.A.

---

[34]*See N.J. coronavirus deaths increase to 11,970 with 162,530 total cases. Hospitalizations fall below 2,000 for 1st time in months,* NJ.com (Jun. 4, 2020), https://www.nj.com/coronavirus/2020/06/nj-coronavirus-deaths-increase-to-11970-with-162530-total-cases-hospitalizations-fall-below-2000-for-1st-time-in-months.html.

2C:33-2(a)(1), a petty disorderly person's offense, and he received no jail time.   *See* JOC. Petitioner has extensive ties to the United States and plans to reside with his sister in Newark, New Jersey, if he is released.   *See* Trujillo Decl. ¶ 5.  The Court is satisfied that there are reasonable conditions that can ensure the public's safety and Petitioner's appearance for his future immigration proceedings.   The specific conditions of release are set forth in the Order accompanying this Memorandum Opinion.

Finally, the Court also finds that Petitioner, who has several underlying conditions that render him vulnerable to complications or death if he were to contract COVID-19, and is currently detained at ECCF where he cannot maintain social distance or adequate hygiene, has established the extraordinary circumstances necessary to warrant the remedy of release on bail, and make bail necessary to make the habeas remedy effective.   *See Cristian A.R.*, 2020 WL 2092616, at *13 (citing *Landano*, 970 F.2d at 1239).

For these reasons, the Court will grant the Petition to the extent it seeks a preliminary injunction directing Petitioner's immediate release on reasonable conditions.   An appropriate Order follows.

Dated:  July 23, 2020                                     */s Madeline Cox Arleo*_____
                                                                    **Hon. Madeline Cox Arleo**
                                                                    **UNITED STATES DISTRICT JUDGE**